## ADRIANCE, (HOTCHKISS v.)

[See Hotchkiss v. Adriance, Case No. 6,715a.]

=====

## ADRIANCE, (SPRAGUE v.)

[See Sprague v. Adriance, Case No. 13,248.]

## Case No. 89.

### The ADRIATIC.

[9 Ben. 98;[1] 16 Amer. Law Reg. (N. S.) 491; 4 Amer. Law T. Rep. (N. S.) 353; 24 Pittsb. Leg. J. 208.]

District Court, S. D. New York. April, 1877.[2]

COLLISION IN THE IRISH CHANNEL—STEAMER AND SAILING VESSEL—IDENTITY OF STEAMER—OPPOSITE COURSES—CONFUSION OF PURPOSE—LIGHTS —STEAMER'S DUTY.

1. The American ship H. Q., with all hands, was sunk at night in the Irish channel, by a collision, as alleged, with the British steamer A. The steamer averred that the ship was either sunk by a collision with some other vessel than the steamer, or was wrecked, and that her loss was not caused by any collision with the steamer. The evidence seemed to be, that the steamer was proceeding down the channel, heading from W. ¼ N. to W. ½ N., and going about 12 knots an hour, and the ship was heading about E. by S. ½ S., with the wind from about S. W., and sailing from 8 to 9 knots an hour. The steamer made the ship's green light about 2 points on the starboard bow. The steamer kept her course for some 4 minutes, until the ship's green light was some 3½ points on the starboard bow, when the ship shut in her green light and showed her red light; whereupon the steamer ported and slowed. The ship then showed her green light again; whereupon the steamer stopped and backed and had got sternway at the time of the collision. Before the collision, the ship made another change, and showed her red light; and the steamer struck the port bow of the ship: *Held*, that the loss of the ship was caused by a collision with this steamer.

2. That, under the circumstances, it was the duty of the steamer to keep out of the way of the ship, and it was the correlative duty of the ship to allow the steamer to keep out of her way, and not to embarrass the steamer in performing such duty.

3. That it was proper for the steamer to keep on her course as long as the ship's green light was visible, and that, when the ship showed her red light, the steamer's duty of avoiding the ship did not cease, and she discharged that duty a second time by porting and slowing.

4. That it was reasonable and proper, under the circumstances, for the officer in charge of the steamer, when he saw a movement in the approaching vessel, indicated by the shutting in of the green and the showing of the red light, to take this as evidence of her intention to throw herself across his onward path.

5. That, it appearing that the officer in charge of the steamer was a good seaman, of capacity, watchful, thoughtful, and deliberate, much must be left to the judgment of such a man, charged with the safety of a large steamer, and of the lives of those on board, as to which one of two or more methods he will adopt in a given exigency, if it is not shown that the one he adopted was such as to indicate that there was no fair exercise of reasonable judgment in concluding to adopt it.

6. That, when the ship again showed her green light, and the danger of collision was apparent and imminent, it was the highest duty of the steamer to stop and back, rather than go ahead and starboard; that, if it be conceded

[1][Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

[2][Affirmed by circuit court in The Adriatic, Case No. 91; and by supreme court in Marshall v. The Adriatic, 2 Sup. Ct. Rep. 355, 107 U. S. 512.]

that the stopping and backing was an error of judgment, it was not a fault.

7. That it was impossible that the changes by the ship from green to red and from red to green could have been caused by the yawing of the ship.

8. That the ship was in fault in her movements in presence of what she could and should have seen was a steamer; that, for what ensued after the ship exhibited her green light a second time, the steamer was not responsible; and that the libel must be dismissed.

[In admiralty. Libel in rem by the owners of the Harvest Queen against the Adriatic. Libel dismissed; also dismissed upon appeal to the circuit court. The Adriatic, Case No. 91. Decree of circuit court affirmed, upon appeal to the supreme court in Marshall v. The Adriatic, 2 Sup. Ct. Rep. 355, 107 U. S. 512.]

Thomas B. Stillman and Henry J. Scudder, for libellants.

Everett P. Wheeler and Joseph H. Choate, for claimants.

BLATCHFORD, District Judge. On the 30th of December, 1875, the ship Harvest Queen, an American vessel, belonging to the libellants, with a cargo on board, also belonging to them, set sail from the harbor of Queenstown, in Ireland, for Liverpool, in England. The steamer Adriatic, a British vessel, sailed from Liverpool to New York, on the same day, and proceeded down the Irish channel. The libel alleges, that, when the ship was distant about fifty miles from her place of departure, and was proceeding up the Irish channel, the wind blowing a stiff breeze from about southwest, and the weather being clear starlight, she was run into by the steamer, at about 3 o'clock A. M., on the 31st of December, the steamer striking the ship on her port bow, with such violence as to cause her, with her cargo, to sink in a very short time after the collision; that by said collision the ship was totally lost, and her master and officers and all hands on board of her were lost; that prior to and at the time of the collision the general course of the ship was up, and the general course of the steamer was down, the Irish channel, and their courses crossed but slightly, if at all; and that the collision was caused by the negligence and improper conduct of those on board of the steamer, in not having a good and sufficient lookout, in running at too great a rate of speed, in not keeping out of the way of the ship, and in not stopping and backing in time to avoid the collision. The libellants claim to recover against the steamer, as damages sustained by the collision, the sum of $225,000.

The answer of the steamer avers that the ship was either sunk by a collision with some other vessel than the steamer, in the Irish channel, on or about the 31st of December, or was wrecked on or about that day in said channel, and that her loss was caused thereby and not by any collision with the steamer. Without discussing in detail the evidence on the subject, it is sufficient to say, that it leaves no doubt in the mind that the steamer, at or about the time and place charged, came into collision with the ship Harvest Queen, belonging to the libellants, in such manner and with such results as to cause the sinking and loss of the ship and of her cargo and of every person on board of her.

The material question in the case, to be determined on the evidence, is as to whether the steamer was in fault. The vessels were sailing on nearly opposite courses. The steamer was heading from west one-quarter north to west one-half north. The ship was heading about east by south half south. They were thus drawing on to the courses of each other from one point to one point and a quarter. The ship was sailing at the rate of from 8 to 9 knots an hour and the steamer at the rate of about 12 knots. The steamer made the green light of the ship at about 2 points on the starboard bow of the steamer. The red light of the ship was not then visible to the steamer. The white and green lights of the steamer, and not her red light, ought then to have been visible to the ship, and undoubtedly were, and it was her duty to heed them. Under the circumstances thus existing, it was the duty of the steamer to keep out of the way of the ship, and it was the correlative duty of the ship to allow the steamer to keep out of her way, and not to embarrass or hamper the steamer in performing such duty. The position was one of safety. The green lights of the two vessels, and only those, were exposed to each other. There was no exposing of green to red. Under this condition of things, the steamer kept on her course, neither porting nor starboarding, nor slowing, nor stopping, nor reversing. It was proper for her to so keep on her course. She had a right to presume that, in the presence of her exposed green light, the ship would continue to expose her green light and that only. There was no obligation on the steamer then to starboard, because the vessels were at such a distance apart, probably 2 miles, that, if both kept their courses, the ship was certain to pass clear, on the starboard hand of the steamer. She would draw more and more on the starboard bow of the steamer. And such was the fact. The ship's green light opened more to the starboard of the steamer until it got to be some 3½ points on the starboard bow of the steamer. This was a position of safety. The ship would not reach the path of the steamer until she was astern of the steamer. At this juncture, and some four minutes after the ship's green light had first been seen by the steamer, the ship shut in her green light and exposed her red light. All the time before that she had exposed her green light, and that alone, steadily, with no glimpse of her red light. Here, then, arose an exigency. Here was danger. The first officer of the

steamer, Mr. Bence, was on her bridge, watching the green light off his starboard bow. He had charge of the steamer at the time and was responsible for her navigation. He had seen the green light for four minutes and had seen it thus open more on his starboard bow. He could not tell to what species of craft it belonged, whether to a fore and aft vessel which could sail within five points of the wind, or to a square-rigged vessel which could not sail nearer to the wind than from six to seven points. He saw a movement in the approaching vessel, indicated by the change in her lights, which it was reasonable and proper for him, under the circumstances, to take as evidence of her intention to throw herself across his onward path. He was called upon suddenly and in an exigency to determine whether he would do anything, and, if something, what. He could, as to the course of his vessel, do one of three things—either let it remain as it was, or starboard, or port. He ported. The libellants insist that he erred in porting; that, if he had not ported, there would have been no collision; that he ought to have starboarded, or, at least, have kept on the same course; that, if he had even kept his course, there would have been no collision, as the ship could not have reached his path ahead of him; and that, if he had starboarded, he would certainly have sailed away from all danger. It is easy to criticise and to be wise after the event. Mr. Bence seems to have been a good seaman, of experience and capacity, watchful, thoughtful and deliberate. Much must be left to the judgment of such a man, charged with the safety of a large steamer and of the lives of those on board, as to which one of two or more methods he will adopt in a given exigency, if it is not shown that the one he adopted was such as to indicate that there was no fair exercise of reasonable judgment in concluding to adopt it. By determining to port and throw the head of the steamer to starboard, Mr. Bence took a course which would certainly, if the approaching vessel continued to display only her red light, very soon bring the vessels on parallel courses, with their red lights exposed to each other. That was safety. To take that course was prudent, and, at the distance apart the two vessels were, it would have been successful, if the ship had continued to expose only her red light. The steamer's duty of avoiding the ship did not cease because the ship shut in her green light and exposed her red light. It continued in the altered circumstances. As the exigency was sudden and unforeseen, and as the vessels were nearing each other rapidly, promptness of decision and action on the part of the steamer was necessary. Even if the ship had continued to expose only her red light, the steamer might, it may be conceded, have passed her in safety by going on at the same speed as before, without starboarding or with starboarding. But I think

it quite clear, that, if the ship had continued to expose only her red light, the steamer would, having ported, have equally avoided a collision with the ship, especially as, on the weight of the evidence, the steamer's engines were slowed at the time her helm was ported. The steamer adopted this manoeuvre of porting and slowing deliberately and wisely. There was no apparent necessity, at that time, that she should stop and reverse her engines. She discharged her duty of avoiding the ship, by proper movements, for the second time. She did this, although the ship was in fault in her movements in the presence of what she could and should have seen was a steamer. These movements of the steamer had been made, and she was swinging to starboard under her port helm, when the ship shut in her red light and exposed only her green light. Seeing this confusion of purpose in the ship, the engines of the steamer were stopped and reversed at full speed. This was proper. There was nothing else for the steamer to do. The ship had twice turned from a course and position in reference to which the steamer had acted, and acted in a way which would have given safety to the ship. Whatever followed the ship had brought upon herself. For what ensued after the ship exhibited her green light the second time, the steamer was not responsible. Before the collision, the ship made another change, and shut in her green light, and showed only her red light.

A strenuous effort was made on the part of the libellants to induce the belief that the changes by the ship from green to red and from red back to green were produced by the yawing of the ship in the following sea and with the free wind. But it is impossible to believe this, for, the green light was visible at first, alone, for four minutes continuously, with no glimpse of the red light, and the green light opened from two points on the starboard bow of the steamer to three and a half points on the same bow, before the red light appeared. The effects of yawing would have been sooner observed.

It is earnestly contended, for the libellants, that the red light of the ship, because of which the steamer ported, was in sight for only one minute, and that, when the green light of the ship again appeared, the steamer should have kept going ahead and should have starboarded. The ship was a third time, and in a third position, imposing on the steamer the duty of avoiding her, after the steamer had twice assumed and discharged that duty. The distance between the vessels was diminishing fast, and with this erratic vessel nearly ahead, and the danger of collision apparent and imminent, it was the highest duty of the steamer to stop and reverse her engines. She did so, and her engines were reversed at full speed, and, on the evidence, she had got sternway on at the time of the collision. If it were to be conceded that the stopping and reversing was an error

of judgment, it could not be held to have been a fault, occurring as it did after what had previously happened, but would be regarded as an error which the libellants could not make a ground of complaint. But it is not to be admitted that it was an error of judgment.

Although the court is asked to condemn the movements of the steamer, no testimony of any expert in seamanship or in navigation is advanced to show that such movements were faulty or unwise or imprudent or unintelligent. The case of the libellants seems to rest on the proposition, that it was the duty of the steamer to keep out of the way of the ship, and that it is not established that the ship changed her course. But the steamer could act only in view of what she saw, and what she had a right reasonably to infer from what she saw. Her movements were taken with a reasonable certainty that they would give safety to both vessels. She exercised the highest degree of diligence imposed by the law, in her efforts to avoid the ship. She exercised that diligence discreetly throughout to the end, in all the emergencies which the vacillating movements of the ship threw upon her.

The libel is dismissed, with costs.